MIGUEL VERGARA, et al.,           )
                                  )
                 Plaintiffs,      )
                                  )
      v.                          )     No.  04 C 6586
                                  )
CITY OF WAUKEGAN, et al.,         )
                                  )
                 Defendants.      )

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, opponents of the towing ordinance adopted by the City of Waukegan ("Waukegan"), have brought this action against Waukegan and two of its officials: Mayor Richard Hyde ("Hyde") and Police Chief William Biang ("Biang").[1]  Plaintiffs assert that defendants violated their rights under the First Amendment[2] and the Fourteenth Amendment's Equal Protection Clause by denying certain plaintiffs entry to Waukegan's monthly city council meeting, by taking action against certain plaintiffs as retaliation for their protest activities and by applying Waukegan's assembly ordinance against certain plaintiffs in an unconstitutional manner.

Plaintiffs have now brought a motion for partial summary

---

[1]  Although plaintiffs had also named Waukegan City Clerk Wayne Motley as a defendant, they later dismissed all of their claims against him.

[2]  This opinion follows the near-universal usage of speaking of the First Amendment rather than the Fourteenth Amendment, even though it is the latter that applies to state actors and has been read to embody various Bill of Rights guaranties.

judgment under Fed. R. Civ. P.("Rule") 56, and defendants have
cross-moved for summary judgment on all counts.[3]  For the reasons
stated below, each side's motion is granted in part and denied in
part.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the
absence of any genuine issue of material fact (Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986)).  For that purpose courts
consider evidentiary records in the light most favorable to
nonmovants and draw all reasonable inferences in their favor
(Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.
2002)).  But to avoid summary judgment a nonmovant "must produce
more than a scintilla of evidence to support his position" that a
genuine issue of material fact exists (Pugh v. City of Attica,
259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific
facts that demonstrate a genuine issue of triable fact" (id.).

---

[3]     This opinion has framed the parties' contentions in the
same fashion that counsel have employed--as seeking "summary
judgment."  But that is simply wrong--despite its common usage by
judges as well as litigants--when all that is at issue is the
viability or nonviability of a theory of recovery.  Success or
failure in that respect does not produce a judgment (or even a
partial judgment) unless the result controls the disposition of
the entire case, or perhaps a discrete "claim" in the federal
sense (in that respect, see the too-little-understood teaching in
NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 291-93 (7th Cir.
1992)).  Hence the actual rulings in this opinion are framed in
terms of their real-world impact.

Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

One more complexity is added where, as here, cross-motions for summary judgment are involved. Those same principles require the adoption of a dual perspective that this Court has sometimes referred to as Janus-like: As to each motion the nonmovant's version of any disputed facts must be credited.[4] What follows, then, is a summary of the undisputed facts.[5]

## Facts

In 2002 Waukegan amended its towing ordinance to authorize the police department to seize and impound vehicles and impose a $500 fine on persons driving without a valid driver's license or proof of insurance (P. Add. St. ¶84). Plaintiffs are nine individuals who have opposed the towing ordinance (D. St. ¶¶11,

---

[4] This District Court's LR 56.1 implements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion identifies plaintiffs' and defendants' respective submissions as "P." and "D.," followed by appropriate designations: LR 56.1 statements as "St. ¶--," responsive statements as "Resp. St. ¶--," additional statements of fact as "Add. St. ¶--," exhibits as "Ex.--" and memoranda as "Mem.--," "Resp. Mem.--" and "Reply Mem.--."

[5] Although the parties submitted a combined total of 444 statements of supposedly material facts in support of their motions, many of those statements were in reality neither material nor undisputed. Hence the summary that follows reflects only a fraction of the assertions contained in the parties' submissions.

13-14; P. St. ¶119; P. Add. St. ¶¶152, 156-57).[6]  Hyde has been

Waukegan's Mayor since 2002 and Biang has been its Police Chief

since 2003 (P. St. ¶¶2-3; D. St. ¶¶1,3).

At the time of the events at issue in this action,

Waukegan's municipal code contained provisions (collectively the

"Outdoor Assembly Ordinance") establishing procedures for

applying for and receiving permits for certain outdoor events (P.

St. ¶56).[7]  Under the Outdoor Assembly Ordinance a written

application for a required permit had to be made to the city

clerk at least 20 days before the event for which the permit was

requested (P. Ex. 4).  Waukegan had the discretion to require the

organizer of covered events to pay a cash deposit in advance of

an event as a condition of issuing a permit for the event (P. St.

¶58).  Waukegan's police department was responsible for

conducting an investigation and making a report and

recommendation to the city clerk in connection with events

covered by the Outdoor Assembly Ordinance (P. St. ¶60).

Plaintiffs' contentions here stem from several events

related to their protest against the towing ordinance and to

---

[6] Virginia Adan, Graciela Lara, Deborah Norman, Jose De
Leon, Victor De Leon, Margaret Carrasco, Chris Blanks and Jose
Zurita are Waukegan residents (P. St. ¶36).  Guadalupe Lara is a
resident of Gurnee, Illinois and works in Waukegan (P. St. ¶37).
All plaintiffs other than the De Leons and the Laras are
hereafter referred to only by their last names.

[7] Effective May 1, 2006 Waukegan repealed and replaced those
provisions (D. Resp. St. ¶56).

defendants' application of the Outdoor Assembly Ordinance.  This
opinion turns to a description of those events.

**Belvidere Mall Rally**

On January 18, 2004 Carrasco organized an event at the
Belvidere Mall in Waukegan to protest the towing ordinance (P.
St. ¶13; D. St. ¶21).  Zurita, Biang and Susana Figueroa
("Figueroa") attended the event (P. St. ¶¶12, 14, 16; D. St.
¶¶24-25).  Figueroa is Waukegan's community liaison officer whose
responsibilities include informing and educating the community
about city issues, regulations and ordinances, coordinating
community meetings and working with churches and education
institutions (D. St. ¶22).

During the Belvidere Mall event Zurita had an encounter with
Figueroa.  Although many aspects of that encounter are in
dispute, the parties agree that Zurita criticized Figueroa by
telling her that "she should do more to help her people" (P. St.
¶15; D. St. ¶26).  Zurita was not arrested or charged with any
offense in connection with the encounter (P. St. ¶17).

After the event Figueroa reported to Hyde that Zurita had
been very angry, had "got in her face" and "was chastising her
because she was a city employee and going along with city
policies" (P. St. ¶18; D. St. ¶28).  Figueroa also told Hyde that
she had been scared that Zurita was going to attack her
physically (D. St. ¶28).

**January 20, 2004 City Council Meeting**

Waukegan's city council, comprising nine aldermen and the mayor, is Waukegan's legislative body and holds regular bi-monthly meetings (P. St. ¶6). Those meetings are held in the City Hall chambers and start at about 8 p.m., with various committee meetings beginning earlier at about 6:30 p.m. (P. Add. St. ¶76). Subject to space constraints, regular city council meetings are open to members of the public (P. St. ¶7). During the "audience time" portion of the meetings, any member of the public may address the city council for up to three minutes, expressing his or her opinion on a subject (P. St. ¶8; D. St. ¶158). As presiding officer and chair of the city council meetings, Hyde is responsible for preserving order and decorum (P. St. ¶10).

Two days after the Belvidere Mall event Zurita attended the January 20, 2004 regular city council meeting (P. St. ¶21). During the "audience time" portion of the meeting individuals addressed the council on various topics, including the towing ordinance, and Zurita approached the microphone to speak (P. St. ¶¶22-23). Before he could do so Hyde chastised him for his earlier comments to Figueroa and told Zurita that he would not permit him to speak until he apologized to Figueroa (P. St. ¶24-

25; D. St. ¶29).[8]

Waukegan Municipal Code ("Code") §2-64(f) provides that any member of the city council may appeal from a ruling of the

---

[8] Although the parties vigorously contest the nature of and motivation for Hyde's reprimand of Zurita, here is Hyde's actual statement as recorded by videotape (P. St. ¶¶24-25; D. Resp. St. ¶¶24-25):

All right.  Now I want to make one thing clear here.  And I was going to talk to this gentleman.  At your meeting, and I want you to pay attention to this too, please.  The City employees do what they are asked by the City ordinances.  We have a community liaison officer.  We don't have an Afro American.  We got a Hispanic.  She works for the City of Waukegan.  Now Sunday she was severely confronted with language right in her face by a male.  And now any man that does that to a woman is lower than a rat.  So before I will hear any person of that speaking, you will come to see me after the council meeting, and you will go to that lady and you will apologize because you severely hurt her personality and her feelings.  Now that was against a City employee who answers to the City and obeys the City rules and laws.  So she - she , nobody else, she is our representative, our community liaison officer for the City of Waukegan.  And whether you like it or not she does one tremendous job.  She is always in meeting with Hispanic areas, community routes.  Sometimes the Afro American people won't even go to see her because she is not Afro American.  But she does a tremendous job for the City.  And if that person does not apologize to her in person to her face, the next time that happens I will have that person arrested and  booked on intimidation.  And that is legal.  That is very legal.  I want to make that known right now because I don't think our employees should have to put up with anything from anybody because they are City employees.  They are doing what they are told to do.  And this Hispanic lady was confronted with a Hispanic man.  And how any man could talk to a woman like that, I don't know.  If he was talked to another man like that he'd be decked.  Right there.  So that's all I have to say about that.  Okay.  No.  I'm not going to listen to you until you get up and you go to – I'm talking to you.  Until you go to Susan Figueroa and you apologize to her.  Thank you.  Okay.  Alderman's time.

council chair, and the ruling will be overruled if a majority of council members present vote against it (P. St. ¶30). Any decision by the mayor to prohibit someone from speaking during the "audience time" portion of meetings is a "ruling" within the meaning of that provision (P. St. ¶31). Code §2-65 establishes a particularized procedure for restricting a person from addressing the council (P. St. ¶32). Under its terms, if a council member objects to a person speaking at the meeting, that person will not be permitted to speak until two-thirds of all council members present at the meeting consent (<u>id</u>.).[9]

None of the aldermen present at the meeting voiced an objection to Hyde's decision or took any steps to overrule it, and Zurita did not request a vote from the aldermen (P. St. ¶¶34-35; D. St. ¶32). Zurita did not address the council during the January 20, 2004 meeting and has not spoken at any city council meeting since (P. Add. St. ¶259).

**Application of Outdoor Assembly Ordinance to Carrasco**

On June 28, 2004 Carrasco and others participated in a march to protest Waukegan's towing ordinance (P. Add. St. ¶119; D. St. ¶34). Sometime after that protest Biang learned that Carrasco

---

[9] Although the parties suggest that both Code provisions apply to Hyde's decision to prohibit Zurita from speaking during "audience time," the two sections appear to establish inconsistent procedures. Regardless of which applies, though, the material fact is that city council members retain veto power over such decisions by the mayor as council chair.

would be conducting a rally to coincide with the upcoming July 6 city council meeting (P. Add. St. ¶120; D. St. ¶38).[10]  On July 1 a police officer went to Carrasco's home to inform her that Biang wished to speak with her that day (D. St. ¶41; P. St. ¶62). Carrasco went to the police station that afternoon, where she met with Biang, three other police officers and city attorney Gretchen Neddenriep ("Neddenriep")(P. St. ¶63; D. St. ¶43).

Exactly what was discussed at the meeting is in dispute. According to Biang, Carrasco said there was going to be a large protest at the upcoming July 6 meeting and estimated that close to 1,000 people would be in attendance (D. Ex. 3).  Carrasco, on the other hand, maintains that she denied any involvement in a planned protest event for July 6 and said that she was aware only that residents who had attended the June 28 march were invited to attend the city council meeting (P. Ex. 61).  Nevertheless the parties agree that Carrasco said that she and other residents would be attending the meeting and that Biang agreed to reserve seats for Carrasco and her group (P. Add. St. ¶¶130-31; D. St. ¶52).  It was Biang's and Neddenriep's belief that Carrasco would be attending the July 6 meeting to address the city council and protest (P. Add. St. ¶132).

---

[10]  Plaintiffs dispute that Carrasco was in fact organizing a rally at the July 6 city council meeting, but they acknowledge that Biang has testified he was informed of Carrasco's alleged plans (P. Resp. St. ¶38).

During the July 1 meeting Neddenriep gave Carrasco a copy of the Outdoor Assembly Ordinance and asked her to comply with its provisions (P. Add. St. ¶127). Carrasco agreed to do so regarding future events (D. St. ¶55). On July 2 Neddenriep sent Carrasco a letter purporting to confirm an agreement reached the day before as to the "proposed assembly" on July 6 (P. Ex. 39). That letter stated that Waukegan agreed to waive the Outdoor Assembly Ordinance's 20-day-in-advance application requirement to seek a permit and told Carrasco that a cash deposit amount of $1500 and a written commitment for insurance would be required (id.). That $1,500 deposit amount was based on Biang's determination, in consultation with other police officers, that an additional ten officers would be needed for the July 6 event (P. St. ¶72).[11] One of Biang's considerations for making that recommendation was the fact that the event was a protest (P. St. ¶¶73-74). Neddenriep's letter also notified Carrasco that Waukegan would not waive the 20-day advance notice requirement in the future (P. Ex. 39).

On July 6 Carrasco sent a letter to Biang and Neddenriep to confirm that "there will be <u>NO EVENT</u> taking place on Tuesday, July 6, 2004" (P. Add. St. ¶137; D. St. ¶57). Carrasco's letter went on to state (P. Ex. 80):

---

[11] Neddenriep then calculated the cash deposit amount in terms of the ten additional officers serving for three hours at $50 per hour (P. St. ¶75).

> Based on several past meetings where attendance at the
> City Council meeting has overflowed, I am unaware of
> any City ordinance or law requiring attendees to pay
> for police wages, to place a cash deposit, nor to
> provide liability insurance in order to attend a City
> Council meeting.

**July 6, 2004 City Council Meeting**

Waukegan's Code provides that the Chief of Police or a
uniformed officer must be present at every city council meeting
to preserve order (P. St. ¶47). Starting in May 2004, members of
the public seeking admission to meetings have been required to
pass through a metal detector, operated by a uniformed police
officer, before being permitted entry (P. St. ¶49). Waukegan has
no written policy, rule, regulation or ordinance governing the
admission of members of the public to city council meetings (P.
St. ¶¶39-46; D. St. ¶160).

Biang and Neddenriep expected a large number of people who
were opposed to Waukegan's towing ordinance to come to the July 6
regular city council meeting, intending to protest outside City
Hall (P. St. ¶¶52-53). On the night of July 6 between 75 and
400 people assembled outside City Hall during the council meeting
(D. St. ¶73). At least seven police officers were present in or
around City Hall, with an additional 15 to 25 members of
Waukegan's rapid response police force staged at a nearby area
for support (P. Add. St. ¶¶143-44). At some point before the
start of the meeting a fire department official determined that
the City Hall attendance limit had been reached, and people were

11

no longer permitted entry into the meeting (D. St. ¶¶72, 74, 83; P. Resp. Mem. ¶¶72, 74). People waiting in line to attend the meeting were told they would have to wait until someone left the meeting before they could be admitted (D. St. ¶78).

Carrasco and Blanks attended the meeting and occupied two of the eight seats that had been reserved for Carrasco (D. St. ¶101). Adan, Norman, Guadalupe and Graciela Lara, and Jose and Victor De Leon (collectively "Vergara Plaintiffs"[12]) also tried to enter the meeting but were denied entry by police officers (P. St. ¶38). During the "audience time" portion of the meeting at least two individuals made comments that several people opposed to the towing ordinance had not been permitted to enter City Hall chambers to attend the meeting (P. Add. St. ¶¶180-81; D. St. ¶108).[13]

_____

[12] Although Michael Vergara (the first-named plaintiff in the case caption) is no longer a party, both sides refer to "Vergara Plaintiffs" throughout their submissions. Accordingly this opinion will employ the same usage.

[13] One of those persons, Luis Lopez, addressed Hyde:

The question is I have seen this place full of people when the Whites come over to complain. Now when the minorities come to complain to you, now there is a limitation as to the number of people that can allow within the premises. What...what is the difference?

Hyde responded, "None." Later in the exchange Lopez again said to Hyde:

The question is, the question is still, I want you to answer how come when the minorities come to complain there is a limitation as to the number of people that

**Application of the Outdoor Assembly Ordinance to Blanks**

Blanks has been an outspoken critic of Waukegan's towing
ordinance since it was adopted (P. Add. St. ¶¶121, 214). In
August 2004 he placed an advertisement in a local community
newspaper for a mass rally to be held on September 4 to garner
support and collect signatures for a 100-page petition in protest
of the towing ordinance (P. Ex. 102). Blanks' advertisement
stated the event would be held from noon until 6 p.m. at
Bedrosian Park in Waukegan and contained telephone numbers for
readers seeking additional information (id.).

As of September 2004 Bedrosian Park was owned and operated
by the Waukegan Park District (P. Add. St. ¶202; D. St. ¶122).
Approximately one half acre in size, the park is bordered by
public streets on two of its sides and by private property on the
others (D. St. ¶123).

Waukegan's Outdoor Assembly Ordinance did not apply to
events held on Park District property (P. Add. St. ¶212).
Instead the Park District has its own ordinance governing the
public use of park properties, including rules about applying for

---

are allowed to this building? And when the whites
complain the room is completely full. What is the
difference?

Hyde again responded, "There is none" and also said, "There
shouldn't be any" (Pl. St. ¶180). When Blanks, the second
individual, addressed the city council, he said he was speaking
on behalf of himself and the "150 you have outside on your front
door" (Pl. St. ¶181).

and obtaining a Park District permit (P. Add. St. ¶203). There
is no specified lead time for submission of a permit application,
and the Park District has the discretion to determine whether to
require a cash deposit or a certificate of insurance for events
(P. Add. St. ¶¶207, 209). As the Park District's Superintendent
of Parks, Michael Trigg is responsible for issuing park use
permits (P. Add. St. ¶208).

After learning of Blanks' advertisement for the September 4
event, Biang instructed Deputy Chief Artis Yancey ("Yancey") to
ask the Park District whether Blanks had received a permit for
the rally and to handle the matter (P. Add. St. ¶217; D. St.
¶126). Yancey learned that Blanks had not obtained a permit from
the Park District and relayed that fact, together with a copy of
Blanks' advertisement, to Neddenriep (P. Add. St. ¶218; D. St.
¶¶127-28).

On September 2 a uniformed police officer delivered to
Blanks a letter written by Neddenriep on behalf of Waukegan (P.
Add. St. ¶¶220-21). That letter advised Blanks that "you are in
violation of Section 15-186 of the Municipal Code of the City of
Waukegan as you failed to obtain a permit from the City Clerk for
[the September 4, 2004] assembly at least 20 days in advance of
the assembly" (P. Ex. 105). It instructed Blanks to comply
immediately with the provisions of the Outdoor Assembly Ordinance
and warned that failure to do so would result in a violation of

14

that ordinance (id.).

Nowhere in Neddenriep's letter did she advise Blanks that the Park District, not Waukegan, owned Bedrosian Park or that he needed to obtain a permit from the Park District (P. Add. St. ¶225).  Copies of the letter were sent to Waukegan's city clerk, to Biang, to several other members of the police department and to Waukegan's city prosecutor (P. Ex. 105).  Upon receiving the letter from Neddenriep, Blanks contacted people by telephone and informed them that the September 4 event was cancelled (P. Add. St. ¶227).

Blanks is the only person ever to be advised in writing and in advance of an event that he was in violation of the Outdoor Assembly Ordinance (P. Add. St. ¶231).  Indeed, Neddenriep's letter to Blanks was only the second time that she enforced the Outdoor Assembly Ordinance, the first instance having been the already-described episode involving Carrasco a few months earlier (P. Add. St. ¶242; D. St. ¶132).

### Zurita's Claim

Zurita has brought this action against Hyde and Waukegan, claiming that his First Amendment rights were violated when Hyde and the city council refused to permit him to speak at the January 20, 2004 city council meeting.  Zurita and defendants have cross-moved for summary judgment on that claim.  For the reasons stated below, summary judgment is granted in favor of

Zurita.

Zurita advances his First Amendment claim under two separate theories. First he argues that the "audience time" portion of city council meetings creates a designated public forum and that the prohibition against his speaking was a content-based restriction that was not narrowly tailored to a compelling government interest. In addition he argues that the actions of Hyde and the city council constituted unlawful retaliation against him for the exercise of his protected speech at the Belvidere Mall rally. Because the first of those contentions is sound, the second need not be addressed.

Whether and to what extent the First Amendment permits a state to regulate the use of and access to government property is a function of the nature of that property. Under the now familiar "forum analysis," government property is classified in terms of three categories: the traditional public forum, the designated public forum and the nonpublic forum (Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 800 (1985)). Traditional public forums are places that have long been devoted to assembly and debate, such as streets and parks (Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)). Public property that the state intentionally chooses to open up for use by the public as a place for expressive activity is considered a designated public forum (id.). And as

the name suggests, a nonpublic forum is public property that is not by tradition or designation a forum for public communication (id. at 46).

In both traditional and designated public forums, the government's ability to regulate expressive activity is limited. Any content-based exclusion is subject to strict scrutiny--that is, the government must show that "its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end" (id. at 45). Reasonable time, place and manner regulations that are content-neutral are permissible, so long as they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication (id.).

Here it is obvious (and indeed defendants do not dispute) that the "audience time" portion of Waukegan's city council meetings renders that situs a designated public forum.[14] Instead defendants argue that any restriction on Zurita's speech was not based on his viewpoint but on his threatening conduct toward Figueroa, making it a permissible content-neutral regulation (D.

---

[14] Any possible doubt in that regard is further dispelled by the same conclusion reached by many courts that have confronted that precise question (see, e.g., City of Madison, Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n, 429 U.S. 167, 175-76 (1976); Mesa v. White, 197 F.3d 1041 (10th Cir. 1999); White v. City of Norwalk, 900 F.2d 1421, 1425 (9th Cir. 1990); Jones v. Heyman, 888 F.2d 1328, 1331 (11th Cir. 1989)).

Resp. Mem. 4).[15]

It is well settled that in public forums the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction" (Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)). City of Madison, 429 U.S. at 176 has explained that the government also may not discriminate among speakers based on their employment status. Underlying these constitutional principles is the notion that "[l]aws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles" (United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 812 (2000)).

Defendants seek to evade those constraints by characterizing

---

[15] Defendants also attempt to defeat Zurita's claim through other assertions requiring minimal discussion. First, they seek to sidestep the issue entirely by arguing that the First Amendment claim as pleaded in the Complaint is based only on alleged retaliation, not on the imposition of an improper time, place and manner restriction (D. Resp. Mem. 4). But our Court of Appeals has long taught not only that it is unnecessary for federal plaintiffs to specify legal theories in a complaint, but also that even the identification of an incorrect legal theory is not fatal (see, e.g., Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992), an authority often cited in later cases for the same proposition). D. Mem. 26 also argues that Hyde did not prohibit Zurita from addressing the council, because he had no right to do so without the prior consent of two-thirds of its members. That contention is negated by the parties' agreement--and by this Court's determination that the "audience time" portion of the meeting created a designated public forum.

Hyde's action as a content-neutral time-manner-place regulation.[16] But that argument begs the question of just what manner of speech defendants sought to regulate. Nowhere do defendants assert that Zurita was planning to address the city council on January 20 in an aggressive or inappropriate fashion, so as to justify a manner-based regulation (or more accurately, complete exclusion). And it cannot logically be said that the exclusion of Zurita's speech at the city council meeting was aimed at regulating the manner of his speech to Figueroa two days earlier. Hyde's decision to exclude Zurita's speech at the January 20 meeting was rather based on his conduct at the Belvidere Mall rally (either what he said to Figueroa or how he said it). Hyde's "regulation" was intended to restrict speech by Zurita--and only Zurita. It was therefore impermissibly aimed at suppressing the speech of a specific speaker, and as such it is subject to strict scrutiny.[17]

---

[16] According to D. Resp. Mem. 4, Hyde refused to permit Zurita to speak at the meeting because of the "threatening manner" in which he had spoken to Figueroa at the Belvidere Mall rally. Whether Zurita's conduct was in fact "threatening" and whether the manner, as opposed to the message, of his speech at the rally was the true motivation for Hyde's refusal are questions of fact that the parties dispute vigorously.

[17] To be clear, nothing in this opinion prevents a city from regulating the speech or even removing a speaker who engages in disruptive or inappropriate behavior in addressing a city council. Cases such as White, 900 F.2d 1421 and Jones, 888 F.2d 1328 (11th Cir. 1989) have upheld regulations that restrict or exclude speech by members of the public at city council meetings. But in those cases the speakers were stopped from addressing the

In those terms defendants plainly lose.  To begin, nowhere in any of their three submissions addressing Zurita's claim do defendants offer any government interest, let alone a compelling one, to justify Hyde's prohibition of Zurita's speech.  Instead that prohibition equates to an effort to sanction Zurita for his conduct toward Figueroa and deter him from engaging in similar conduct in the future.  Not only does that flunk the compelling-state-interest test, but an absolute prohibition on Zurita's right to speak at the city council meeting cannot conceivably be found to be narrowly tailored to that purpose.  As stated earlier, Zurita is entitled to prevail on his First Amendment claim.

**Defendants' Liability**

Zurita argues that he is entitled to summary judgment against both Hyde and Waukegan for that violation of his First Amendment rights.  Defendants respond (1) that Hyde is entitled to qualified immunity for his actions at the January 20 city council meeting and (2) that any imposition or that municipal liability on Waukegan is improper.

**1.  Hyde's Liability**

Kentucky v. Graham, 473 U.S. 159, 166 (1985) (emphasis in

---

councils because their conduct at those meetings violated neutral time-manner-place regulations.  That is very different from the factual situation presented here, where the manner of Zurita's proposed speech at the January 20 city council meeting is not at issue.

original) teaches that "to establish _personal_ liability in a

§1983 action, it is enough to show that the official, acting

under color of state law, caused the deprivation of a federal

right." Defendants do not dispute Hyde's liability on that

basis, but instead peg Hyde's defense on an assertion of

qualified immunity as to Zurita's claim.

On that score the seminal opinion in <u>Harlow v. Fitzgerald</u>,

457 U.S. 800, 818 (1982) held that "government officials

performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of

which a reasonable person would have known." <u>Harlow</u>, <u>id</u>.

(footnote omitted) further instructed:

> On summary judgment, the judge appropriately may determine,
> not only the currently applicable law, but whether that law
> was clearly established at the time an action occurred. If
> the law at that time was not clearly established an official
> could not reasonably be expected to anticipate subsequent
> legal developments, nor could he fairly be said to "know"
> that the law forbade conduct not previously identified as
> unlawful.

More recently <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001) has

enunciated a two-part test for qualified immunity. First, the

alleged facts, when considered in the light most favorable to the

party asserting an injury, must show that the officer's conduct

violated a constitutional right (<u>id</u>.). If so, the second

question is whether the right was then clearly established (<u>id</u>.).

<u>Saucier</u>, <u>id</u>. explained that "[t]his inquiry, it is vital to note,

must be undertaken in light of the specific context of the case, not as a broad general proposition...."

Because Hyde's refusal to permit Zurita to speak at the city council meeting did indeed violate Zurita's constitutional rights, the question remaining is whether those rights were clearly established.  In that inquiry "binding precedent is not necessary to clearly establish a right" (Brokaw v. Mercer County, 235 F.3d 1000, 1022 (7th Cir. 2000)).  Rather than having to point to a closely analogous case, a plaintiff "can establish a clearly established constitutional right by showing that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue" (id.).

That is the case here.  Courts have long held that city council meeting sites, during the "audience time" portions of council meetings, and similar venues are designated public forums subject to constitutional limitations on the regulation of speech (see n.14).  It has also been well established that governmental action suppressing the speech of particular individuals "contradict[s] basic First Amendment principles" (Playboy Entm't Group, 529 U.S. at 812).  Those solidly established principles trump any disclaimer by Hyde of knowledge that the law forbade his prohibition of Zurita's speech.  No qualified immunity insulates him from liability.

### 2.    Waukegan's Liability

Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658
(1978) has long been the leading authority on municipal
liability.  Such liability can generally be shown in one of three
ways:  (1) by "an express policy that, when enforced, causes a
constitutional deprivation," (2) by "a widespread practice that,
although not authorized by written law or express municipal
policy, is so permanent and well settled as to constitute a
custom or usage with the force of law" or (3) by a showing that
"the constitutional injury was caused by a person with final
policymaking authority" (Baskin v. City of Des Plaines, 138 F.3d
701, 704-05 (7th Cir. 1998)).  Here Zurita argues that Waukegan
is liable on that last basis because Hyde is a final policymaker
and the city council ratified his decision.

    Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)
explained that under Monell "[m]unicipal liability attaches only
where the decisionmaker possesses final authority to establish
municipal policy with respect to the action ordered." But
Pembaur, id. at 481-82 then cautioned that "[t]he fact that a
particular official--even a policymaking official--has discretion
in the exercise of particular functions does not, without more,
give rise to municipal liability based on an exercise of that
discretion."  Instead "municipal liability under §1983 attaches
where--and only where--a deliberate choice to follow a course of
action is made from among various alternatives by the official or

23

officials responsible for establishing final policy with respect to the subject matter in question" (id. at 483).  Finally Pembaur, id. instructed that "[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority" as a matter of state law.

Gernetzke v. Kenosha Unified Sch. Dist. No. 1, 274 F.3d 464, 464, 468-70 (7th Cir. 2001) provides further clarity about when an official is a "final policymaker" for purposes of municipal liability.  Gernetzke, id. at 469 explains that municipal liability is limited "to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority."

Courts have also recognized that a "municipality may also be liable for the actions of an employee who lacks final policymaking authority if that employee's actions were 'ratified' by the municipality" (Killinger v. Johnson, 389 F.3d 765, 772 (7th Cir. 2004)).  As City of Louis v. Praprotnik, 485 U.S. 112, 127 (1988)(emphasis in original) explains, "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies."  Plaintiffs seeking to establish municipal liability based on a

ratification theory "must allege that a municipal official with final policymaking authority approved the subordinate's decision and the basis for it" (Baskin, 138 F.3d at 705).

P. Mem. 6-7 argues both that Hyde was a final decisionmaker and that the city council ratified his decision. But if the first of those contentions is correct, review or ratification by the city council would be superfluous at best. Conversely, if ratification is essential to create municipal liability via the city council's action (or in this case inaction), Hyde would have to be viewed as a subordinate rather than a final policymaker.

Although Hyde has authority as city council chair and presiding officer to make rulings about who may or may not speak during the "audience time" portion of meetings, he cannot be labeled the final policymaker because there is "higher authority" that can overrule his decisions: Waukegan's Code establishes procedures by which city council members could have objected to Hyde's decision and voted to overturn it (P. St. ¶¶30-32). That power makes the entire city council the truly final policymaker on such issues.

That, however, does not carry the day for defendants. Although city council members did not specifically vote on the approval or endorsement of Hyde's ruling as to Zurita, each of them individually--and all of them as a body--had the power to raise an objection but declined to exercise it. Because they

witnessed and heard the entire exchange between Hyde and Zurita, including Hyde's purported justification for his action, their letting that action stand without any challenge must be viewed as a ratification of Hyde's decision. And because that ratification was by Waukegan's final authority, it amounts to municipal policy for which Waukegan is liable.

### Vergara Plaintiffs' Claim

Vergara Plaintiffs have brought a claim based on their being denied admission to the July 6, 2004 city council meeting. First they advance a facial constitutional challenge to Waukegan's alleged ad hoc policy as to admitting members of the public to city council meetings. Next they contend that defendants are also liable for viewpoint discrimination in connection with their actions at the July 6 meeting. Vergara Plaintiffs have moved for summary judgment on their facial constitutional challenge alone, while defendants have moved for summary judgment on both contentions.

**Facial Challenge**

Waukegan admittedly has no written policies, rules, regulations or ordinances governing the admission of the public to city council meetings (P. St. ¶¶39-46). Vergara Plaintiffs argue that Waukegan instead "employs various shifting and standardless ad hoc policies that create an unacceptable risk of viewpoint discrimination" (P. Mem. 7). At the core of that

argument is the assertion that an unwritten policy confers unbridled discretion on Waukegan officials to permit or deny expressive activity in the form of attendance at public city council meetings (id. at 8-9)).  According to Vergara Plaintiffs, that scheme violates the First Amendment under Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123 (1992).

At the threshold, Vergara Plaintiffs must first establish the existence of a municipal policy before they can mount a facial challenge to that policy (Monell, 436 U.S. at 690).  For many plaintiffs that poses no difficulty, for most facial challenges are brought against state or municipal ordinances or written policies.  But that is not so here.  Instead Vergara Plaintiffs charge Waukegan with employing an unwritten and standardless policy that is therefore unconstitutional. Necessarily the first step in the analysis must be a finding that such a policy exists.

Vergara Plaintiffs do little in that respect, relying instead on the fact that there is no written policy governing admission to city council meetings.  But it does not automatically follow that the practice actually followed is in fact ad hoc or standardless.  Instead the actual practice must itself be scrutinized (K.F.P. v. Dane County, 110 F.3d 516, 519-20 (7th Cir. 1997)).

In that regard D. Resp. Mem. 7 says (and Biang and Hyde

27

testified) that Waukegan admits members of the public to city council meetings on a neutral first-come-first-served basis. Biang also testified that Waukegan's first-come-first-served practice was the standard admission procedure that Waukegan's police officers had followed for 29 years (Biang Dep. 223:11-223:14). P. Reply Mem. 9 counters with only two instances in which the city failed to admit members of the public on a first-come-first-served basis. Plaintiffs' own Complaint admits that "[u]ntil the events of the July 6, 2004, meeting seats were filled on a first-come-first-served basis" (D. Ex. 110 ¶32). Just two instances in the long history of Waukegan city council meetings clearly does not suffice--even with the required benefit of favorable inferences--to establish a municipal policy or practice that is subject to constitutional attack (see <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 821 (1985)).[18]

Thus Vergara Plaintiffs have no platform from which to launch a facial constitutional attack. On that score defendants win, and Vergara Plaintiffs' motion is denied.

---

[18] Vergara Plaintiffs argue that Waukegan's actual practice should not be considered because facial attacks on the basis of overly broad discretion are dependent not on how that discretion is exercised, but rather on whether anything prevents discrimination on the basis of viewpoint (P. Mem. 10-11; P. Reply Mem. 6-7). But that position skips the first step of the constitutional analysis: determining whether there is any municipal policy that can properly be challenged. And Waukegan's actual practice must necessarily be examined to answer that question.

**Discriminatory Treatment at July 6, 2004 City Council Meeting**

Vergara Plaintiffs' second contention is that defendants
engaged in unconstitutional viewpoint discrimination against them
at the July 6 city council meeting (P. Resp. Mem. 15).  To that
end they assert that they were treated differently by being
excluded (1) from attendance during the entire city council
meeting, (2) from entering the meeting room to address the city
council during the "audience time" portion of the meeting and
(3) from entering City Hall and standing outside the city council
chambers to listen to the meeting (id. at 15-16).

In those respects Vergara Plaintiffs seek to target Biang
and Hyde as subject to individual liability for the claimed
offenses.  This opinion turns then to that subject before taking
up the issues of disparate treatment and the potential liability
of Waukegan itself.

For an individual to be held liable in a Section 1983
action, he or she must have caused or participated in the alleged
constitutional deprivation (Wolf-Lillie v. Sonquist, 699 F.2d
864, 869 (7th Cir. 1983)).  As Gentry v. Duckworth, 65 F.3d 555,
561 (7th Cir. 1995)(citations and internal quotation marks
omitted) explains:

> An official satisfies the personal responsibility
> requirement of section 1983...if the conduct causing the
> constitutional deprivation occurs at [his] direction or with
> [his] knowledge and consent.  That is, he must know about
> the conduct and facilitate it, approve it, condone it, or
> turn a blind eye....  In short, some causal connection or

affirmative link between the action complained about and the official sued is necessary for §1983 recovery.

Even with the evidence viewed in the light most favorable to Vergara Plaintiffs, neither Biang nor Hyde can be said to have participated in or played a causal role in the alleged constitutional deprivations. At most the evidence shows that Biang or Hyde knew that some members of the public were denied access to the City Hall meeting. There is no evidence, however, that either Biang or Hyde directed or even knew the officers stationed outside of the meeting were impermissibly restricting access to the City Hall based on Vergara Plaintiffs' viewpoint.

As for Biang, the main thrust of Vergara Plaintiffs' argument is that he did not take steps to ensure that protesters were admitted to the July 6 meeting (P. Resp. Mem. 19).[19] Nowhere do they allege that Biang affirmatively engaged in viewpoint discrimination toward members of the public trying to gain admission to the meeting. Biang's testimony is that before the meeting he went back and forth from the council chambers to the outside to monitor the protest activity (Biang Dep. 239:18-

---

[19] P. Resp. Mem. 19 also contends that Biang's conduct in connection with the application of the Outdoor Assembly Ordinance to Carrasco in the days before the meeting somehow contributed to the alleged constitutional violation involving the exclusion of the Vergara Plaintiffs from the July 6 meeting. But any misconduct by Biang in connection with Carrasco relates only to Carrasco's claims and is in no way probative of whether Biang engaged in impermissible viewpoint discrimination at the July 6 meeting.

240:18).  No evidence suggests that he was involved in actually admitting people to (or excluding people from) the meeting. Indeed, Biang was required to be in the city council chambers during the meeting (id.).

Biang further testified that he was not aware that anyone was prevented from entering the meeting until approximately 7:45 p.m., when the fire department official determined that the occupancy limit had been reached (id.).  Vergara Plaintiffs offer no contradictory evidence or anything to show Biang's personal involvement in or knowledge of the constitutional deprivations they allege.  Instead their arguments are based in large part on what he did not do to ensure their admission to the city council meeting.

That, however, does not do the job.  Individual liability of officials under Section 1983 must be based on their own unconstitutional behavior, not merely on their negligence in supervising employees (Rascon v. Hardiman, 803 F.2d 269, 273-74 (7th Cir. 1986)).  At worst it appears that Biang knew there were protesters who were denied entry to the meeting.  But because there were many more people at the meeting than could actually be admitted, that fact alone is unremarkable.  Because Vergara Plaintiffs have presented no evidence that Biang either engaged in viewpoint discrimination himself or was aware that other officers did so and either condoned it or ignored it, Biang bears

no personal liability.

Hyde is free from personal liability for the same reasons. Although Hyde like Biang may have been on notice that certain protesters were not permitted to enter the July 6 meeting, no evidence suggests that he knew it was because of their viewpoint rather than space constraints or occupancy limits. Vergara Plaintiffs rely on the statements of Lopez and Blanks at the July 6 meeting to show that Hyde knew that more people had been allowed to attend prior city council meetings. But those comments at most informed Hyde that occupancy limits were being enforced at the July 6 meeting and that more than 100 people were not able to gain admission. Vergara Plaintiffs proffer no evidence that even implies (let alone showing) that Hyde participated in or knew that admission decisions were being made on an unconstitutional basis.

So much then for the absence of liability for Vergara Plaintiffs' individual targets. But what of Waukegan itself? Although Vergara Plaintiffs' motion has not sought summary judgment on the ground now under consideration, Waukegan has joined Biang and Hyde in seeking exculpation on that score. This opinion therefore turns to that subject.

In the way that Vergara Plaintiffs have posed the issue of Waukegan's possible liability, they would clearly fail to recover. Because neither Biang's nor Hyde's actions suffice to

establish personal liability, neither can they serve as the basis for municipal liability. And Vergara Plaintiffs' arguments as to the city council's possible responsibility are exactly the same as those they advanced with respect to Hyde and, for the reasons stated earlier, also cannot tag the city council with liability for the alleged viewpoint discrimination. Hence Vergara Plaintiffs' stated theories would not save their claim against Waukegan either.

But it will be recalled that the assertion of wrong legal theories is not the test for the viability or nonviability of a legal claim (see n. 15). And what is surprising here is that Vergara Plaintiffs' greatest likelihood of success against Waukegan itself would rest on a legal approach not fully explored by the parties. Because the issue is posed in the context of Waukegan's effort to prevail as a matter of law, this opinion would be remiss if it did not examine that route to potential liability.

Monell's fundamental lesson is that Section 1983 liability cannot be thrust on a municipality via respondeat superior principles (436 U.S. at 694). But the consequent effort to differentiate final policymakers (whose conduct is directly ascribable to a municipality) from those farther down the food chain (whose conduct is not) is often incapable of bright-line resolution, a point particularly well articulated by Judge Posner

33

in <u>Gernetzke</u>, 274 F.3d at 468-70.

In this instance there appears to be a substantial basis for focusing instead on the police officers who perforce made the unreviewed decisions as to admitting persons to, or excluding persons from, the meeting--decisions that by their very nature made those officers the <u>final</u> authority. <u>Gernetzke</u>, <u>id</u>. at 469, citing to Justice O'Connor's like analysis for the Supreme Court plurality in <u>Praprotnik</u>, 485 U.S. at 126-27, put the matter in a way that would appear directly applicable to this case:

> Only the delegation ("conferral" would be a better term) of final authority makes the "delegate" the final authority.

Because that creates the potential for Waukegan's liability, though no definitive answer is possible on the current state of the record (neither side having focused on the matter from that perspective), it is worth taking a look at the evidence offered to this point as to the existence vel non of viewpoint discrimination. In support of Vergara Plaintiffs' contention that they were denied admission to the July 6 meeting because of their opposition to and criticism of Waukegan's towing ordinance, they point to their own testimony that other people were admitted to the meeting after they were denied entry (Adan Dep. 70:8-71:7, 79:1-79:7; Guadalupe Lara Dep. 54:7-54:15; Jose De Leon Dep. 42-45, Victor De Leon Dep. 29:17-29:24, 33:19-34:15).[20] In addition,

---

[20] Vergara Plaintiffs "are members of a group, mostly African-American and Latino, of Waukegan residents who have

Dale Doucette testified that when he approached two police officers who appeared to be controlling access to the meeting, one of the officers asked him whether he was with the group of protesters who had assembled nearby. After Doucette responded that he was not, he was allowed to enter the meeting (Doucette Dep. 54:18-56:1).[21]

Defendants offer a host of arguments to challenge the contention that Vergara Plaintiffs were excluded from the July 6 meeting because of their viewpoint.[22] While those arguments may perhaps have force with a jury, they do not defeat Vergara Plaintiffs' assertions as a matter of law.

---

joined together to protest the City of Waukegan's towing ordinance" (D. Ex. 110 ¶5). Vergara Plaintiffs contend that defendants were aware of the viewpoint of the Hispanic and African American comminutes and therefore knew that Vergara Plaintiffs, as members of those communities, were opposed to the towing ordinance.

[21]     D. Mem. 6-7 contends that Doucette's statement is inadmissible hearsay because Vergara Plaintiffs do not identify the officer to whom Doucette spoke. But that betrays a lack of understanding of the fundamental principle embodied in Fed.R.Evid. 801(d)(2)(D), which expressly labels as <u>nonhearsay</u> any such statement by a party's agent (in this case the police officer). Hence the exchange between Doucette and the officer is admissible evidence and properly considered in ruling on defendants' motion.

[22]     Defendants first argue that police officers were not aware of Vergara Plaintiffs' viewpoint because they did not specifically ask them about it. They also point to evidence showing that other known protesters were allowed entry to the meeting. And finally, they contend that the occupancy limit was reached at 7:45 p.m., at which time people were legitimately excluded from entering City Hall.

At this point, then, the current motion must be denied.  And it too early to tell whether a full fleshing out of the issues might call for a different result in the future.

## Carrasco's Claims

Carrasco asserts that Biang and Waukegan violated her constitutional rights by applying the Outdoor Assembly Ordinance to her in an discriminatory manner, engaging in unlawful retaliation for her exercise of First Amendment rights and attempting to chill her future exercise of those rights. Carrasco has moved for summary judgment on her as-applied constitutional challenge to the Outdoor Assembly Ordinance, while defendants have moved for summary judgment on all fronts.

## As-Applied Challenge

Unlike a facial challenge to the constitutionality of a law or ordinance, an as-applied challenge asserts that an enactment is unconstitutional as applied to a plaintiff's specific First Amendment activities even though it is capable of valid application to others (Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 803 & n.22 (1984)). Although the Complaint here originally contained a facial constitutional challenge to the Outdoor Assembly Ordinance as well, that contention was dismissed after Waukegan amended the ordinance in 2006.  Carrasco's as-applied challenge to the pre-amendment version of the Outdoor Assembly Ordinance remains.

In that respect Carrasco asserts that the Outdoor Assembly
Ordinance was applied to her differently and less favorably than
it was to non-protesters.  Among other things Carrasco argues
that the amount of the cash deposit required by Biang and
Waukegan for her asserted July 6, 2004 plans[23] constituted
impermissible viewpoint discrimination because it was based on
the fact that the supposed event was a protest rally rather than
a rally in support of Waukegan's towing ordinance.[24]

In support of that argument Carrasco relies on Biang's
testimony that in determining the number of police officers to
assign to the July 6 rally, he considered the fact that the event
was a protest--had the rally been in support of the towing
ordinance, he would have assigned fewer officers.  Because the
cash deposit amount was a direct function of the number of police
officers assigned, Carrasco reasons that the deposit amount

---

[23]  To be clear, Carrasco has at all times maintained that
there was no rally or event planned for the July 6 city council
meeting.  But Carrasco has alleged that Biang and Neddenriep
believed there was and that they acted under that belief to apply
the Outdoor Assembly Ordinance to her in an unconstitutional way.
Whether or not Carrasco actually did plan an event is therefore
irrelevant to her constitutional claim (see this Court's May 26,
2006 order denying defendants' motion to dismiss Count V of the
Third Amended Complaint).

[24]  Carrasco also contends that the manner in which Waukegan
applied the Outdoor Assembly Ordinance to her, both procedurally
and substantively, was based on Carrasco's viewpoint and status
as a protest organizer.  Because Carrasco prevails on the ground
just stated in the text, that second contention need not be
addressed.

required by Biang and Waukegan was unconstitutionally based on the content of Carrasco's speech.

Biang and Waukegan seek to explain Biang's testimony and the decision it reflects by asserting that the decision was not based on the protesters' viewpoint as such but rather on Biang's expectation that the protesters would be angry (D. Resp. Mem. 12-13). Under that theory any controversial or potentially hostile protest would require additional police officers and security precautions, in turn increasing the amount of the cash deposit required by Waukegan, regardless of the message or viewpoint of the protesters.

When a law, whether in its application or on its face, regulates or restricts speech based on its content, it runs afoul of the First Amendment. As <u>Police Dep't of City of Chicago v. Mosley</u>, 408 U.S. 92, 95 (1972) instructs, "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."

<u>Forsyth County</u> (mentioned earlier in the section of this opinion captioned <u>Facial Challenge</u>[25]) involved a facial challenge

_____

[25]    Although that section refers to Vergara Plaintiffs' heavy reliance on <u>Forsyth County</u> in support of their facial challenge to Waukegan's admission policy for city council meetings, it is odd that plaintiffs' counsel do not discuss it in relation to Carrasco's claim.  Even though there was no as-applied challenge to the ordinance in <u>Forsyth County</u>, that does not render its constitutional analysis irrelevant.  On the

to a county ordinance that permitted the administrator to vary
the fee for assembling or parading to reflect the estimated cost
of maintaining public order.  Forsyth County, 505 U.S. at 132-33
held that the ordinance was unconstitutional on its face because
it lacked any "narrowly drawn, reasonable and definite standards"
to guide the fee determination.  Not only did the ordinance
create the potential for viewpoint censorship, said the Court,
but it often required that the fee be content-based (id. at 133-
34).  Because the fee would often be assessed to cover the
security costs of persons participating in and observing
activities, it necessarily required that the fee be based on the
content of speech and the amount of hostility it was likely to
create (id. at 134).  Although Forsyth County, id. at 136
recognized that "raising revenue for police services ...
undoubtedly is an important government responsibility, it does
not justify a content-based permit fee."

Forsyth County's theoretical concerns about the possibility
of content-based fee determinations became reality for Carrasco
in this case.  Biang and Waukegan admit that the cash deposit
they required of Carrasco was a function of the number of
officers they assigned to the event, based in turn on the fact

------------------------------------------------------------

contrary, the potential difficulties that Forsyth County found
with the ordinance at issue there are the precise problems that
Carrasco encountered in the present case.  For that reason
Forsyth County's analysis is of particular relevance.

that the event was to be a protest attended by potentially hostile and angry demonstrators. As <u>Forsyth County</u>, <u>id</u>. at 134-35 held:

> Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend an angry mob.[26]

D. Resp. Mem. 11-13 responds that the reasons for assigning extra officers to the July 6 rally were content-neutral. But by arguing that a protest on any subject, and not just one that opposes Waukegan's policies, would require additional police costs, Biang and Waukegan confuse content-based discrimination with viewpoint discrimination. As <u>Mesa</u>, 197 F.3d at 1045 n.4 put it succinctly:

> Viewpoint discrimination is a form of content discrimination, but not all content-based regulation is viewpoint regulation.

In other words, a Waukegan regulation that applied only to protests of its own policies would undoubtedly constitute impermissible viewpoint discrimination. But a regulation based upon the nature of an event or speech, even if neutral as to viewpoint, is also correctly characterized as content-based (cf. <u>Thomas v. Chicago Park Dist.</u>, 227 F.3d 921, 925 (7th Cir.

---

[26] [Footnote by this Court] That line of analysis echoes the approach taken by the brilliant Professor Harry Kalven, the preeminent First Amendment scholar of an earlier generation, in identifying and decrying what he called the "heckler's veto." Given its origin, it is unsurprising to encounter that label in Judge Posner's opinion in <u>Thomas</u> 227 F.3d at 925, cited in the text below.

2000)).[27]

Next D. Resp. Mem. 14-15 invokes <u>Cox v. New Hampshire</u>, 312
U.S. 569 (1941) and similar cases to argue that Waukegan is
entitled to collect the costs of its public services provided at
the rally. <u>Cox</u>, <u>id</u>. at 577 found that a provision of a state
statute authorizing the imposition of a fee on event organizers
was constitutional, even though the municipality determined the
fee in relation to the expense incurred in maintaining public
safety. But it is noteworthy that the half-century-later opinion
in <u>Forsyth County</u>, 505 U.S. at 136 expressly rejected that
County's attempted reliance on <u>Cox</u> (a reliance that the <u>Forsyth
County</u> dissenting Justices would have found persuasive).

In short, nothing in <u>Cox</u> releases Biang or Waukegan from
complying with the constitutional proscription against content-
based discrimination. And because that was not done in this
case, Carrasco prevails on her as-applied challenge to the
Outdoor Assembly Ordinance.

**Unlawful Retaliation**

Carrasco next charges that Biang's and Neddenriep's decision
to apply the Outdoor Assembly Ordinance to her and their

---

[27]   D. Resp. Mem. 13 suggests that for Carrasco to prove
content-based discrimination she must somehow show that fewer
officers would be required at a protest in support of the towing
ordinance where protesters were expected to be upset and angry at
Waukegan. For the reasons stated in the text, and because of the
impermis-sibility of justifying governmental conduct based on the
"heckler's veto," that argument misses the boat.

resulting conduct were taken in retaliation for her prior protest activities.  To prevail on such a retaliation claim Carrasco must show[28] (1) her speech was constitutionally protected, (2) Biang's and Neddenriep's actions were motivated by her constitutionally protected speech and (3) those defendants cannot show they would have taken the same action in the absence of her exercise of First Amendment rights (<u>Vukadinovich v. Bd. of Sch. Trustees of N. Newton Sch. Corp.</u>, 278 F.3d 693, 699 (7th Cir. 2002)).  If Carrasco can establish the first two elements, the burden then shifts to those defendants to prove that they would have taken the same actions regardless of Carrasco's protected speech (<u>id</u>.). And if they can meet that burden, Carrasco must then show that the proffered justifications were pretextual (<u>id</u>.).

Biang and Neddenriep do not dispute the first element of the <u>Vukadinovich</u> analysis:  that Carrasco engaged in protected speech (D. Mem. 16 n.6).  Instead they claim that Carrasco cannot demonstrate that her speech was a substantial or motivating factor for the alleged retaliatory actions and that the actions would have been taken in any event, even absent Carrasco's speech

_____

[28]  As elsewhere in this opinion, this Court has followed the language of the caselaw that speaks of what a plaintiff must "show" or "prove" or "establish" or the like.  But in the summary judgment context, of course, the target has the lesser burden of demonstrating the existence of a material (that is, potentially outcome-determinative) issue of fact.  This opinion has imposed that lesser burden whenever there is a material factual dispute, despite this Court's having tracked the more demanding language used in most of the cases.

(D. Mem. 15).

As to the issue of retaliatory motive, a defendant's knowledge of protected speech, coupled with close temporal proximity between the speech and the allegedly retaliatory action, is sufficiently probative to withstand summary judgment (cf. such cases, dealing with the concept of liability for retaliatory conduct in the employment context, as McClendon v. Ind. Sugars, Inc., 108 F.3d 789, 796-97 (7th Cir. 1997); Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir. 1994); Maestas v. Segura, 416 F.3d 1182, 1189 (10th Cir. 2005); and Miller v. Fairchild Indus. Inc., 797 F.2d 727, 731-32 (9th Cir. 1986)).[29] Here the alleged retaliatory action by Biang and Neddenriep took place on July 1 and July 2, 2004, just a few days after Carrasco's protected speech during the June 28 march (D. St. ¶¶40-43). Biang's awareness of Carrasco's June 28 activity is doubly confirmed: First he admits that he was told that protesters at the march had been very hostile to police and the towing ordinance, and second he says that Carrasco made representations at the march that led to the July 1 meeting regarding the Outdoor Assembly Ordinance (D. St. ¶¶38-39).

Those facts alone suffice to raise an issue of fact as to

---

[29] There is no principled difference between the concept of liability for retaliatory conduct in such cases and comparable liability in a case such as this. So further citations in the text will also draw on employment law sources.

retaliatory motive and thus to defeat defendants' motion for summary judgment. And an analysis of the arguments offered in response does not alter that conclusion.

By way of such response, Biang and Neddenriep first point to the fact that Carrasco has a generally positive opinion of Biang and believes that he "universally treats people with respect," as though that somehow shows that Biang could not have possessed a retaliatory motive in this case (D. Mem. 15-16). But such general feelings are inapposite to the question whether Carrasco's speech was a substantial factor in Biang's decision to apply the Outdoor Assembly Ordinance to her. After all, Carrasco did bring this lawsuit against Biang, so that her generally favorable feelings about Biang did not prevent her from believing that he violated her constitutional rights in this instance.

Next up is some factual evidence that Biang cooperated with and assisted Carrasco before and after the alleged retaliatory action (D. Mem. 16-17). In conjunction with that evidence, Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997 (7th Cir. 2000) is invoked as assertedly defeating Carrasco's retaliation claim as a matter of law. True enough, Miller does require a court ruling on a summary judgment motion to consider the record as a whole, including any facts that demonstrate the absence of bias (id. at 1007 n.7). But given the evidence that suggests Biang and Neddenriep acted with a retaliatory motive, the "record as a

whole" plainly poses genuine issues of material fact about whether Biang's and Neddenriep's actions were motivated by Carrasco's speech.

That then moves the inquiry to step three: whether Biang would still have requested the July 1 meeting with Carrasco, even absent her prior protests (D. Mem. 17). In that regard Biang and Neddenriep say that it was Carrasco's statement to a police officer about the need for police officer attendance at the July 6 city council meeting that triggered Biang's request to meet with Carrasco (id.). But whether Carrasco actually made that statement is a fact the parties dispute, so that it cannot support a pro-defendant ruling as a matter of law.

D. Mem. 17-18 also argues that Biang had safety concerns about the July 6 meeting and that Waukegan has a duty to ensure safety in public areas. So, say Biang and Neddenriep, they would have taken the same actions regardless of Carrasco's speech.

Given the history of Waukegan's enforcement (or more accurately nonenforcement) of the Outdoor Assembly Ordinance, those arguments are simply not persuasive. All of the record evidence confirms that the actions of Biang and Neddenriep as to Carrasco and the application of the Outdoor Assembly Ordinance were completely out of the ordinary and in some cases unprecedented (P. Add. St. ¶¶186-201 and accompanying exhibits). Surely a reasonable factfinder could find a failure to carry the

burden of showing that the same actions (actions that had never been taken in the past) would have been taken absent Carrasco's speech.

All that then eliminates any need to demonstrate pretext. And so the motion for summary judgment on Carrasco's retaliation claim must be and is denied.

**Chilling of Future Conduct**

Finally, Carrasco asserts that Biang's and Neddenriep's allegedly retaliatory actions were taken to chill the future exercise of her First Amendment rights (P. Resp. Mem. 32). In that respect "retaliation need not be monstrous to be actionable under the First Amendment; it need merely create the potential for chilling [speech]" (<u>DeGuiseppe v. Vill. of Bellwood</u>, 68 F.3d 187, 192 (7th Cir. 1995)). To that end the courts employ an objective test, asking whether defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from continuing to engage in the protected activity (<u>Bart v. Telford</u>, 677 F.2d 622, 625 (7th Cir. 1982)).

In those terms the uncontested facts advanced by Carrasco, even though the preceding section of this opinion merely rejected defendants' effort to obtain judgment as a matter of law on her retaliation theory, are nonetheless are sufficient to support potential recovery under the First Amendment on her assertion as to the chilling of future conduct. It is undisputed that a

uniformed police officer was sent to Carrasco's home to request that Carrasco attend a meeting with Biang at the police station (D. St. ¶41). Neddenriep's letter sent to Carrasco after that meeting not only (1) stated a purported agreement about the permit procedures Carrasco needed to follow but also (2) warned Carrasco that failure to comply with the agreement would result in violations of Waukegan's Code and (3) specifically instructed Carrasco that Waukegan would not waive the advance notice period for future permit applications (P. Ex. 39). Those actions, together with Carrasco's allegation that the Outdoor Assembly Ordinance was selectively enforced against her, surely create a reasonable inference that a person of ordinary firmness might be intimidated and deterred from future activity.

Biang and Neddenriep point to Carrasco's protest activity both before and after the alleged retaliation as proof that Biang's actions did not chill her speech. But as Carrasco correctly notes, the chilling standard is an objective one-- although a plaintiff's response to retaliatory conduct may be helpful in that regard, it is not dispositive (see Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005); Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003), quoting and relying on Bart). So while evidence of Carrasco's conduct may be relevant to a factfinder considering the question, it cannot be said as a matter of law that Biang's

and Neddenriep's actions are incapable of chilling the speech of a person of ordinary firmness.

**Defendants' Liability**

Carrasco argues that both Biang and Waukegan are liable for violating her First Amendment rights (P. Mem. 14-15). Biang contends that he is entitled to qualified immunity as to all of Carrasco's allegations, and Waukegan urges that Carrasco cannot establish municipal liability against it under <u>Monell</u> (D. Mem. 21-23 and 32-33).

### 1. Biang's Liability

Biang does not dispute that he made the decision as to the number of officers to assign to what he believed was Carrasco's July 6 rally, nor does he deny that he was involved in the July 1 meeting with Carrasco and Neddenriep regarding the Outdoor Assembly Ordinance. Instead he argues that because it was Neddenriep who requested a cash deposit from Carrasco, he cannot be liable for her decision (D. Resp. Mem. 15).

But Biang's not having requested the cash deposit himself does not mean that he did not participate in Carrasco's constitutional deprivation. In addition to his direct involvement with Carrasco on July 1, Biang was copied on Neddenriep's July 2 letter to Carrasco. That shows he knew about the letter and the application of the Outdoor Assembly Ordinance to Carrasco, and he also facilitated it by making the

recommendation to Neddenriep regarding the number of officers to be assigned.  Hence Biang can be held individually liable for violating Carrasco's First Amendment rights.

D. Mem. 32-33 and D. Resp. Mem. 15 also argue that Biang is entitled to qualified immunity against Carrasco.  Carrasco has succeeded on her as-applied theory, and her retaliation contention has withstood summary judgment.  As a result Carrasco has shown that Biang's conduct, if proved, violated her constitutional rights (Saucier, 533 U.S. at 201).  Whether those rights were clearly established is the next question.

First, as to Carrasco's as-applied theory, the protections afforded by the First Amendment and the Equal Protection Clause have long been held to prohibit disparate treatment and regulations that discriminate on the basis of the content of speech.  But more specifically, Forsyth County, decided by the Supreme Court more than ten years before the events in this case, expressly discussed the unconstitutionality of determining permit fees for public events based on the nature of an event as an unpopular protest with potentially hostile and angry crowds.  In the face of such Supreme Court authority on the subject, Biang's qualified immunity argument simply fails.[30]

---

[30]   D. Resp. Mem. 15 argues that "Biang's conduct is not actionable because it was taken in the course of his normal duties to have sufficient officers on hand to prevent injuries in public areas to people or property."  That argument is yet another unsuccessful attempt to convince this Court that Biang

Next Carrasco's retaliation contention, if successful, will necessarily have established that (1) Biang's actions with respect to the application of the Outdoor Assembly Ordinance were taken in retaliation for Carrasco's prior protest activities and (2) Biang would not have engaged in the same conduct absent those activities. As the age of the cases cited here on the substantive issue of retaliation shows, Carrasco's right to be free from such retaliation for her First Amendment activity was well established when Biang acted. In sum, Biang is not entitled to summary judgment on qualified immunity grounds.

## 2. Waukegan's Liability

Carrasco argues that Waukegan is liable under Monell for the alleged violations of her constitutional rights. Carrasco first contends that Biang or Neddenriep (or both of them) is or are "final policymakers" under Monell (P. Mem. 14-15). Carrasco also argues that Waukegan has a practice or custom of enforcing the Outdoor Assembly Ordinance differently and less favorably against protesters.

To survive summary judgment on her first theory, Carrasco must show that Biang or Neddenriep had authority to establish municipal policies as to the actions she alleges were unconstitutional (see Pembaur, 475 U.S. at 481). What follows

---

did not engage in unconstitutional discrimination. It is irrelevant to the qualified immunity inquiry.

here looks at each of the two in those terms.

First, in connection with the cash deposit requirement and Carrasco's as-applied challenge, Carrasco claims that Waukegan Municipal Ordinance ("Ordinance") §15-188 requires the police department to estimate the costs of police services for events covered by the Outdoor Assembly Ordinance (P. Mem. 15). But that characterization goes too far. Ordinance §15-188 requires the police department to complete an investigative report of the permit applicant and proposed assembly and to submit written recommendations in connection therewith (D. Ex. 102). It does not, however, specifically impose on the police department the ultimate responsibility to determine police costs in connection with a proposed event. Any determination in that regard is merely a recommendation (id.).

Carrasco then claims that the responsibilities conferred on the Chief of Police by Ordinance §§17-61 and 17-62 establish Biang as a final policymaker (P. Mem. 15). Although Ordinance §17-62(8) does authorize the Chief of Police to execute and enforce all Waukegan ordinances, it does not specifically provide for the responsibility of determining the amount of the cash deposit under the Outdoor Assembly Ordinance (D. Ex. 106). Without his having been granted that express authority, this Court cannot find that Biang is responsible for establishing final policy as to the required cash deposit under the Outdoor

51

Assembly Ordinance.

As for Neddenriep, Carrasco claims that Ordinance §§2-266 and 2-267 delegate to her, as corporation counsel, "full charge of all the law business of the city," including the power to "[c]ompromise with the party complained of either before or after an action shall have been brought for the violation of an ordinance" (P. Mem. 15; P. Resp. Mem. 31). In sending Carrasco the July 2, 2004 letter, Neddenriep was acting pursuant to that authority.

In response Waukegan cites Auriemma v. Rice, 957 F.2d 397, 400 (7th Cir. 1992) for the proposition that Neddenriep merely executes rather than makes law. Auriemma, id. does draw a distinction for purposes of municipal liability between the creation and implementation of rules, explaining that Monell "is not to be sabotaged by calling the chief bureaucrat who signs off on a particular action the city's 'policymaker' for that action." Instead Auriemma, id. at 401 (internal quotation marks omitted) concludes that "[r]esponsibility for making law or setting policy -- the objective under Praprotnik of our search through local law -- is authority to adopt rules for the conduct of government." Gernetzke, 274 F.3d at 468 has further clarified that standard in these terms:

> The question is whether the promulgator, or the actor, as the case may be--in other words, the decision-maker--was at the apex of authority for the action in question.

By determining whether and how the Outdoor Assembly
Ordinance should apply to citizens like Carrasco, Neddenriep did
in fact have the authority to adopt rules for the conduct of
government.  Waukegan's Code delegated to her, as corporation
counsel, the authority to handle potential or actual violations
of Waukegan ordinances.  In this case she acted pursuant to that
authority--and created policy--when she decided to enforce the
Outdoor Assembly Ordinance against Carrasco and to enforce it in
the manner she did.  Waukegan is therefore liable for actions
taken by Neddenriep that violated Carrasco's constitutional
rights.

## Blanks' Claim

Like Carrasco, Blanks asserts that Biang and Waukegan
violated his First Amendment rights by applying the Outdoor
Assembly Ordinance to him in an unconstitutional manner, engaging
in unlawful retaliation for his exercise of his First Amendment
rights and attempting to chill his future exercise of those
rights.  Although his claim stems from a different set of
facts--those related to his proposed September 4, 2004 protest
event at Bedrosian Park--the legal standards for resolving the
summary judgment motion that targets that claim are the same that
have been discussed in this opinion regarding Carrasco.  That
being so, there is no need to repeat them.  This opinion turns
directly to the application of those standards.

**As-Applied Challenge**

For his as-applied challenge, Blanks charges that Biang and Neddenriep applied the Outdoor Assembly Ordinance to him differently and less favorably than to non-protesters and that Blanks' viewpoint was a motivating factor in the disparate treatment. That contention calls for a look at the claimed disparate treatment.

In that regard Blanks (like Carrasco) points to evidence that the manner in which the Outdoor Assembly Ordinance was applied to him was highly unusual -- really an understatement. He was the first and only person ever to be advised in writing in advance of a proposed event that he was in violation of the Outdoor Assembly Ordinance (P. Add. St. ¶231), and Neddenriep's letter to Blanks was delivered to him at his home by a uniformed police officer (P. Add. St. ¶221). Blanks also presents evidence that Kelly Link, Waukegan's Special Events Coordinator at the time of the event, normally reviewed applications for permits under the Outdoor Assembly Ordinance and expected to be informed of any upcoming events (P. Add. St. ¶¶95-96). But Link was not made a participant in discussions about the September 2 letter to Blanks, nor was she advised that the letter was even sent to Blanks (Link Dep. 154:10-13; P. Ex. 51 ¶¶223-24).

What is more, according to Waukegan's former Special Events Coordinator David Motley, the Outdoor Assembly Ordinance did not

apply to events held at Bedrosian Park in any event, singling out
Blanks to an even greater extent (if possible) (P. Add. St.
¶212).  In light of the wholly irregular treatment of both
Carrasco and Blanks, coupled with the fact that they were both
known protesters against Waukegan's towing ordinance, it is
indeed an understatement to say that a reasonable factfinder
could conclude that their viewpoint was a motivating factor for
defendants' actions.[31]

Little if anything is offered by way of response to Blanks'
as-applied challenge.  In fact, in responding to Carrasco and
Blanks' contention that Waukegan has a practice or custom of
enforcing the Outdoor Assembly Ordinance in a discriminatory
manner, they admit that Carrasco and Blanks can demonstrate that
Waukegan "treated them uniquely" (D. Reply Mem. 9).

In short, summary judgment for defendants must be (and is)
denied on Blanks' as-applied challenge.  This opinion goes on to
his retaliation claim, as to which at least some response has
been essayed.

**Unlawful Retaliation**

As with Carrasco, it is undisputed that Blanks' protest

---

[31]  D Mem. 23 argues (albeit in response to Blanks's
retaliation claim) that Neddenriep did not know of Blanks' prior
protests before speaking with Yancey.  But that is a red
herring--after all, as soon as Neddenriep saw Blanks'
advertisement for the Bedrosian Park event, she certainly had
knowledge that Blanks was planning to protest Waukegan's towing
ordinance.

activities are constitutionally protected speech. Instead the claimed response is that Biang and Neddenriep had no motive to retaliate against Blanks and that his speech was not chilled.[32]

That issue of motivation poses a more complicated question. Although the relevant inquiry is one of causation, a "motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions" (Spiegla v. Hull, 371 F.3d 928, 942 (7th Cir. 2004)). Massey v. Johnson, 457 F.3d 711, 717 (7th Cir. 2006)(citation omitted) has elaborated on the required showing:

> Moreover, as in other contexts where motivation is at issue, the plaintiffs are not required to come forward with direct evidence or "the so-called smoking gun." Circumstan-tial proof, such as the timing of events or the disparate treatment of similar individuals, may be sufficient to establish the defendant's retaliatory motive.

Blanks engaged in numerous protest activities against Waukegan's towing ordinance, including attending the June 28 Belvidere Mall Rally and speaking at the July 6, 2004 and August 2, 2004 city council meetings (D. St. ¶10). Biang admits that he was aware that Blanks was an outspoken critic of the towing

---

[32] Defendants also argue that Blanks had no right to hold the rally because he did not obtain a permit from the Park District and therefore has no claim for damages "no matter what the City did" (D. Mem. 26). That is simply not true. There was no time requirement specified for Blanks to obtain a permit. It cannot be said that Blanks would have been prevented from holding his event at Bedrosian Park even absent the alleged actions of Biang and Neddenriep.

ordinance from the time it was adopted (P. Add. St. ¶121). Though Neddenriep is said to have been unaware of Blanks' prior protests before she spoke with Yancey (D. Mem. 23), that is not the point: What is at issue are the actions that Neddenriep took to enforce the Outdoor Assembly Ordinance against Blanks <u>after</u> that conversation. And considering the evidence in the light most favorable to Blanks, including the facts as to the disparate treatment of Blanks and Carrasco, a reasonable juror could surely conclude that Blanks' earlier protests of the towing ordinance was a factor that motivated defendants' actions.

Under the proof framework for retaliation claims, the next question is whether defendants can show that they would have taken the same actions absent a retaliatory motive. But just as with Carrasco, the evidence suggesting that Neddenriep's actions were contrary to Waukegan's normal practice for enforcing the Outdoor Assembly Ordinance reveals that issues of fact exist on that element as well. So defendants' summary judgment motion on Blanks' retaliation claim is also denied.

**Chilling of Future Conduct**

Here Blanks was treated in a manner similar to the treatment accorded Carrasco -- treatment that for reasons already explained meets the "ordinary firmness" test (<u>Bart</u>, 677 F.2d at 625). What is more, Neddenriep's letter to Blanks, which informed him that he was in violation of Waukegan's Outdoor Assembly Ordinance, was

57

sent to Waukegan's city prosecutor.  It does not pass the
straight-face test to argue that such conduct would not deter a
person of ordinary firmness from continuing to engage in
protected activity--unsurprisingly, Blanks' speech was in fact
chilled:  He cancelled the proposed event at Bedrosian Park (P.
Add. St. ¶227).  Enough said.

**Defendants' Liability**

    **1.    Biang's Liability**

    Although Biang's alleged role with respect to the
enforcement of Waukegan's Outdoor Assembly Ordinance against
Blanks was more limited than his alleged involvement with
Carrasco, the factual evidence still suggests a "causal
connection or affirmative link" between Biang and the alleged
constitutional violations (<u>Gentry</u>, 65 F.3d at 561).  Blanks
presents evidence that the alleged conduct occurred at Biang's
direction when Biang instructed Yancey to "handle the matter" (P.
St. ¶217).  Biang was copied on Neddenriep's September 2 letter
to Blanks, making it reasonable to infer that he had knowledge of
the actions taken against Biang.  That evidence clearly suffices
at a minimum, under the standard articulated in <u>Gentry</u>, to raise
a triable issue of fact regarding Biang's personal liability.

    Again a straw man is raised by way of response--a claim of
qualified immunity for Biang (D. Reply Mem. 12).  What was said
earlier as to that contention regarding Carrasco's claim applies

here as well.  Biang is not entitled to qualified immunity here
either with respect to Blanks' claim.

**Waukegan's Liability**

As in the just-completed discussion of Biang's potential
liability, the question of municipal liability as to Blanks'
claim needs only a reference back to the analysis of that same
issue regarding Carrasco's allegations.  As was the case there,
Waukegan's corporation counsel Neddenriep was a "policymaker"
within the meaning of Pembaur and related cases, so that her
actions to enforce the Outdoor Assembly Ordinance against Blanks
created municipal policy for which Waukegan may be held liable.

**Conclusion**

For the foregoing reasons, this Court:

1.   grants Zurita's motion for summary judgment on his
First Amendment claims against Hyde and Waukegan (and of
course denies defendants' cross-motion on that claim);

2.   denies Vergara Plaintiffs' motion for summary judgment
(and grants defendants' cross-motion) on the  facial
challenge to Waukegan's unwritten admission policy for city
council meetings;

3.   grants the motion of Biang and Hyde for summary
judgment on Vergara Plaintiffs' claim based on their
exclusion from the July 6, 2004 city council meeting, while
it denies Waukegan's like motion on that score;

4. grants Carrasco's motion for summary judgment on her as-applied challenge to the Outdoor Assembly Ordinance against Biang and Waukegan, while rejecting defendants' motion as to her contentions of retaliation and chilling of future conduct; and

5. denies defendants' motion for summary judgment on Blanks' as-applied, retaliation and chilling contentions against Biang and Waukegan.

This action is set for a status hearing at 9 a.m. on December 29, 2008[33] to discuss all aspects of the further proceedings in this case.

_____
Milton I. Shadur
Senior United States District Judge

Dated:     December 22, 2008

---

[33]     This Court of course recognizes that the short work week between Christmas and New Years may pose a problem because of previously scheduled vacations or the like. It has nonetheless designated December 29 because its calendar for the entire month of January is already overscheduled. But if any counsel finds the December 29 date is unavailable or unduly inconvenient, he or she should promptly call this Court's minute clerk Sandy Newland (312-435-5767), and a substitute time and date may be arranged.